**CARDTOONS, L.C., Plaintiff,**

v.

**MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION, Defendant.**

**No. 93–C–576–E.**

United States District Court,
N.D. Oklahoma,
Tulsa.

Oct. 25, 1994.

James W. Tilly, Keith Ward, Tilly & Ward, Tulsa, OK, Eric C. Cohen, Suzanne Hines, Welsh & Katz, Chicago, IL, for Cardtoons, L.C.

James E. Weger, Jones, Givens, Gotcher & Bogan, Rebecca Brett, Martin & Shelton, Tulsa, OK, Dennis D. Palmer, Michael P. Allen, Russell S. Jones, Jr., Shughart, Thomson & Kilroy, Kansas City, MO, Gregory K. Frizzell, Tulsa, OK, for Major League Baseball Players Ass'n.

Joseph Mauro, First Amendment Publishing, Inc., Northport, NY, amicus curiae for First Amendment Publishing, Inc.

### ORDER

ELLISON, Chief Judge.

The Court has for consideration the Report and Recommendation of the Magistrate (Docket # 38) to which the parties have objected. Also before the Court: Plaintiff's Motion for Summary Judgment (Docket # 17), Defendant's Motion for Declaratory Judgment (Docket # 11), Plaintiff's Motion for Temporary Restraining Order (Docket # 2), Plaintiff's Motion for Preliminary Injunction (Docket # 2), and Plaintiff's Motion to Expedite Request for Declaratory Relief (Docket # 2). The Magistrate's Report and Recommendation (hereinafter "Report," cited as "R. and R.") was prepared after extensive briefing by the parties and an evidentiary hearing before the Magistrate, and it was adopted by the Court. In the Report, the Magistrate found that Plaintiff violated Defendant's rights under Okla.Stat. tit. 12, § 1449(A), Oklahoma's right of publicity statute. The Court has set aside its adoption of the Report and Recommendation and its Order of Judgment (Docket # 48) so that thorough consideration can be given to the parties' objections to the Report and Recommendation, as well as recent authority from the Supreme Court.

■ Defendant claims that its product, a set of baseball cards labelled "Cardtoons," is parody. Common targets of parody are widely-known individuals and institutions. It has been acknowledged that parody must, to some extent, copy its subject matter.

Parody's humor, or in any event its comment, necessarily springs from recognizable allusion to its object through distorted imitation. Its art lies in the tension between a known original and its parodic twin. When parody takes aim at a particular original work, the parody must be able to "conjure up" at least enough of that original to make the object of its critical wit recognizable.

*Campbell v. Acuff–Rose Music, Inc.,* —— U.S. ——, ——, 114 S.Ct. 1164, 1176, 127 L.Ed.2d 500 (1994). "A parody frequently needs to be more than a fleeting evocation of an original in order to make its humorous point."

*Elsmere Music, Inc. v. National Broadcasting Co.,* 623 F.2d 252, 253 (2d Cir.1980) (citing *Columbia Pictures Corp. v. National Broadcasting Co.,* 137 F.Supp. 348, 354 (S.D.Cal.1955)). To be an effective parody of baseball cards, it is necessary that Cardtoons trading cards imitate the general configuration of baseball cards.

If Cardtoons' cards were not published in (3½″ × 2½″) card form, they would not evoke the parodically-necessary theme of traditional baseball cards in Cardtoons' audience. Likewise, if Cardtoons was to forego placing any image of an actual baseball player on its cards, the cards' status as baseball card parodies would be obscured. It is the evocation of the image of particular baseball players that is the basis of MLBPA's position, because Oklahoma's right of publicity extends to "images" of people. Without the inclusion of an image, however, it is essentially impossible to create effective parody, because parody relies, in substantial part, on visual identification with the parody's target.

The nature of Plaintiff's product is significant: are Cardtoons trading cards parody? Webster's Third New International Dictionary defines parody as "a writing in which the language and style of an author or work is closely imitated for comic effect or in ridicule often with certain peculiarities greatly heightened or exaggerated." *See also* R. and R. at 23 n. 27 (838 F.Supp. 1501, 1514 n. 27) (N.D.Okl.1993); *Acuff–Rose.,* —— U.S. at ——, 114 S.Ct. at 1172. In this *de novo* review, it is evident that Cardtoons' cards are parody: the general style of baseball cards has been imitated, but the images of the players found on the front side of the cards, and the biographical material on the back, have been exaggerated. While Plaintiff's assurance that the cards are non-commercial does not withstand scrutiny, neither does Defendant's portrayal of the cards as purely commercial. Cardtoons are both commercial and parody, and must be considered as both.

■ The Report acknowledges that "the Constitution 'accords a lesser protection to commercial speech than to other constitutional guarantees of expression.'" R. and R. at 32 (838 F.Supp. at 1520) (citing *Central Hudson Gas & Elec. Co. v. Public Serv. Comm'n.,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)). "Lesser protection" is not the equivalent of "no protection." That Plaintiff's speech is a product does not rescind its First Amendment protection. *Central Hudson,* 447 U.S. at 563–564, 100 S.Ct. at 2350; *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 765, 96 S.Ct. 1817, 1827, 48 L.Ed.2d 346 (1976). "Indeed, the singular reason for using the players' likenesses and/or names is to entice the consumer to purchase the product. Without such likenesses and names, the profit potential dwindles." R. and R. at 33 (838 F.Supp. at 1521). Without the likenesses and names, the *parody* potential of Cardtoons also dwindles.

Creating a successful commercial parody of a well-known person is not as simple as creating a successful commercial counterfeit of a well-known product. A counterfeiter adds nothing to the original. A parodist takes a person, exaggerates and distorts facets of the person until hilarity ensues, and markets the result. The result is not the equivalent of the original: the parodist has studied the original and modified it until it is something that could never be mistaken for its progenitor. It is reasonable that a parodist would seek compensation for his efforts, for though the parodist takes substantial inspiration from his subject, he creates something that did not exist before.

Oklahoma's right of publicity statute reads:

Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods, or services, without such person's prior consent ... shall be liable for any damages sustained by the person or persons injured as a result thereof, and any profits from the unauthorized use that are attributable to the use shall be taken into account in computing the actual damages.

Okla.Stat. tit. 12, § 1449(A) (1985).[1]

■ The Oklahoma statute protects a person's right of publicity. The right of publicity has been summarized as "the right to prevent others from using one's name or picture for commercial purposes without consent." *Douglass v. Hustler Magazine, Inc.,* 769 F.2d 1128, 1138 (7th Cir.1985), *cert. denied,* 475 U.S. 1094, 106 S.Ct. 1489, 89 L.Ed.2d 892 (1986). The purpose of the Oklahoma statute is to protect individuals, celebrities or otherwise, from having distinguishing characteristics of their persona exploited, to the commercial benefit of another. The statute advises that a person's name, voice, signature, photograph, or likeness is protected. In the present case, the only characteristic that must be considered is "likeness."

The Magistrate applied a three-part test in the Report to determine if Cardtoons had violated the Oklahoma statute.

> To prove that § 1449(A) has been violated, MLBPA must show that Cardtoons has: (1) "knowingly" used MLBPA's "name" or "likeness"; (2) on "products, merchandise or goods"; (3) without MLBPA's prior consent. If MLBPA proves those elements, the "burden" shifts to Cardtoons to raise a valid defense.

R. and R. at 15 (838 F.Supp. at 1511). The test applied in the Report accurately incorporates the elements of the offense. The Court agrees with the Magistrate's conclusion that MLBPA has proven the three elements, and that Cardtoons' conduct was contrary to the statute. The Court further concurs with the Report and Recommendation in that the defenses provided within the statute are not applicable to Plaintiff. Thus, the issue in this case is precisely that as identified by the Magistrate: "Is there a First Amendment 'parody' defense for a commercial product under a balancing approach? Or, put simply, can one *sell* a parody?" R. and R. at 22 (838 F.Supp. at 1515).

The Court will not firmly employ any one test in weighing MLBPA's right of publicity, for the simple reason that one has not yet been devised. When guidelines for judicial application of a law to a set of specific facts do not exist, a rational response is to reach out to a like area of law and adopt a test that has survived years of application. The Magistrate Judge decided the question of a parody defense to the right of publicity by applying tests developed in copyright and trademark caselaw, because the right of publicity is similar to copyright and trademark law in that these areas are within the realm of intellectual property.

The Magistrate applied two tests: a "use analysis" and a "balancing analysis." These tests can assist the trier of fact in isolating the numerous issues that must be considered in determining the extent of the right of publicity. The strict application of either of these tests to a right of publicity case, however, can result in various factors receiving improper consideration. The Court declines to determine the extent of the right of publicity by relying exclusively on tests developed in other areas of the law, but will review the tests to ascertain their applicability to the right of publicity.

■ Trademark law employs a balancing analysis. The resemblance of trademark law to the right of publicity is hazy. "[A]fter adding up all the differences and similarities, the differences outweigh the similarities." J. Thomas McCarthy, *The Rights of Publicity and Privacy,* 5–6 (1994).

> Courts and commentators have often remarked on the kinship and resemblance of trademark law to the law of the Right of Publicity. But, unfortunately, some courts have failed to see the important distinctions and have unthinkingly imported certain inapplicable pieces of trademark doctrine into Right of Publicity cases. Such courts miss the important reality that the

---

**1.** Oklahoma's first right of publicity statute, Okl. Stat. tit. 21, § 839.1–3, was passed in 1965. The statute was modelled on a New York statute, New York Civ. Rights Law §§ 50, 51. Oklahoma's statute was supplemented by the Oklahoma legislature in 1985 with Okla.Stat. tit. 12, § 1449, which is virtually identical to California's right of publicity statute, Cal.Civ.Code §§ 990 and 3344. *See* Lucian Wayne Beavers, *Oklahoma's Right of Publicity Laws,* 57 Okla.Bar J. 2612 (1986).

Right of Publicity is only *analogous,* not *identical,* to the law of trademarks.

*Id.* at 5–9 (emphasis in original) (citations omitted). Recognizing that dangers in the application of trademark law to the right of publicity exist, it still may be possible to successfully transpose the value of trademark law analysis to the present case.

Trademark infringement is governed by the Lanham Act. Section 32(1) of the Lanham Act provides for civil liability when an alleged infringer uses a trademark in a way that is "likely to cause confusion, or to cause mistake or deceive." 15 U.S.C. § 1114(1)(a). Parodies of trademarks have been found to violate the Lanham Act when a likelihood of confusion has been created. *See Anheuser-Busch, Inc. v. Balducci Publications,* 28 F.3d 769, 778, 781 (8th Cir.1994); *Nike, Inc. v. Just Did It Enterprises,* 6 F.3d 1225 (7th Cir.1993); *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Group,* 886 F.2d 490 (2d Cir.1989). The Report cites three methods of analysis relied upon by courts in weighing parody and the First Amendment in trademark cases.

The first method simply recognizes parody as an affirmative defense to a Lanham Act claim. R. and R. at 26 (838 F.Supp. at 1517). This lends support to the general proposition that parody qualifies as an affirmative defense to the right of publicity. The second method mentioned in the Report is a balancing of the rights of a trademark owner against First Amendment concerns. The third method states that "parody is not a defense to trademark infringement, but rather is another factor to be considered in the likelihood of confusion equation." R. and R. at 27 (838 F.Supp. at 1518) (citing *Schieffelin & Co. v. Jack Co. of Boca, Inc.,* 725 F.Supp. 1314, 1323 (S.D.N.Y.1989)).

The Report refers to *Jordache Enters., Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482 (10th Cir.1987), for support. Unlike *Jordache,* which involved competing lines of denim jeans, the likelihood of confusion in the context of Cardtoons is minimal. It is impossible for consumers to believe that Cardtoons are traditional, officially licensed cards when each card proclaims that Cardtoons are not licensed.[2] Second, *Jordache* states, "parody is an attempt to derive benefit from the reputation of the owner of the mark ... if only because no parody could be made without the initial mark." *Id.* at 1486. The court further reasoned, "where two marks are confusingly similar, or where there is evidence of actual confusion, a likelihood of confusion can exist despite the intent to create a parody." *Id.* Applying this analysis to Cardtoons results in the conclusion that because no likelihood of confusion exists. Cardtoons' intent to create a parody—even one in the context of a commercial use, as in *Jordache*—prevails.

The Report's trademark law balancing analysis is flawed. The analysis finds that Cardtoons' speech is commercial, that commercial speech receives less First Amendment protection than other kinds of speech, and thus, the baseball players' right of publicity prevails. This reasoning is identical to the copyright law "use analysis" that it also employed in the Report. The Report mentions in a footnote that another factor to be weighed in a "balancing analysis" are the ramifications of a decision allowing Cardtoons a First Amendment defense in this case. R. and R. at 33 n. 35 (838 F.Supp. at 1521 n. 35).

■ The Report expresses concern about the prospect of other companies creating parody cards of baseball players, or other sports professionals.[3] This would purportedly open

---

2. Cardtoons are individually, explicitly labelled as "parody." Whether this was done to negate any possible confusion with traditional, licensed cards, or to deter a lawsuit such as is now before this Court, is not relevant to decision. "Parody serves its goals whether labelled or not, and there is no reason to require parody to state the obvious (or even the reasonably perceived)." *Acuff-Rose,* — U.S. at — n. 17, 114 S.Ct. at 1173 n. 17 (citation omitted). *But see Anheuser-Busch, Inc. v. Balducci Publications,* 28 F.3d

769, 778, 781 (8th Cir.1994) (in trademark case, "tiny disclosure" that parody advertisement was actually editorial commentary might increase consumer confusion).

3. Although inappropriate, the observation is accurate. *See* Amicus Brief, First Amendment Publishing at 1 (company presently engaged in selling unlicensed parody trading cards of professional basketball players).

a "floodgate" of other commercial products. It is inappropriate to characterize this concern as a "factor" in the setting of a district court applying a balancing analysis, and the Court therefore deletes any consideration of potential proliferation of parodies from its balancing analysis.

Because trademark analysis is predominantly concerned with the likelihood of confusion issue, its utility in construing Oklahoma's sweeping right of publicity statute in a parody situation is minimal. The Report observed, "*Jordache* and the other trademark cases do not paint a clear picture of when parodies used in commercial settings should receive First Amendment protection." R. and R. at 27 (838 F.Supp. at 1517). The unclear picture, coupled with trademark law's emphasis on consumer confusion, prompts the Court to refrain from relying upon specific forms of trademark analysis in reaching its decision in the present case.

■ Copyright law utilizes the fair use doctrine. The Supreme Court has noted that the goals of the right of publicity are closely analogous to the goals of patent and copyright law. *Zacchini v. Scripps–Howard Broadcasting Co.*, 433 U.S. 562, 573, 97 S.Ct. 2849, 2856, 53 L.Ed.2d 965 (1977). The applicability of copyright law to the right of publicity has been suggested by several commentators: "[t]he analogy between assertion of the Right of Publicity and copyright law in the context of parody and satire seems apt." McCarthy, *supra*, at 8–108.[4] The Supreme Court has given substantial consideration to the question of copyright fair use in a parody context: "[t]he threshold question when fair use is raised in defense of parody is whether a parodic character may reasonably be perceived." *Acuff–Rose*, — U.S. at —, 114 S.Ct. at 1173.94058334. It is indisputable that a parodic character may be reasonably perceived in Cardtoons trading cards. Thus, under the standard applicable to parody under copyright law, Cardtoons would be eligible for a fair use analysis.

A fair use analysis is based on applying four illustrative guidelines:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. An understanding of the illustrative nature of the fair use guidelines is a precondition to their correct application.

First, the factors contained in Section 107 are merely by way of example, and are not necessarily an exhaustive enumeration. This means that factors other than those enumerated may prove to have a bearing upon the determination of fair use ... In addition, Section 107 gives no guidance as to the relative weight to be ascribed to each of the listed factors ... ... the courts are left with almost complete discretion in determining whether any given factor is present in any particular case.

Melville Nimmer, 3 *Nimmer on Copyright*, § 13 at 13–156 to 13–157 (1994 rev.). The inherent flexibility of fair use analysis lends itself to application in a right of publicity context.

The Report cites three fair use cases for the proposition that commercial parodies cannot assert a fair use defense. The first case, *Tin Pan Apple, Inc. v. Miller Brewing Co., Inc.*, 737 F.Supp. 826 (S.D.N.Y.1990), is quoted for the statement, "...appropriation of copyrighted material solely for personal profit, unrelieved by any creative purpose, cannot constitute parody as a matter of law." R. and R. at 29 (838 F.Supp. at 1518) (citing *Tin Pan Apple*, 737 F.Supp. at 830). The Court has determined that Cardtoons are a mixed use: the cards were created for commercial profit, and they possess creative purpose. *Tin Pan Apple* involved a product devoid of any creative aspect. Thus, the

---

4. *See also* Restatement (Third) of Unfair Competition § 47 at 182 (Tentative Draft 4, 25 March 1993); Beth Warnken Van Hecke, *But Seriously, Folks: Toward a Coherent Standard of Parody as Fair Use*, 77 Minn.L.Rev. 465 (1992); Randall T.E. Coyne, *Toward a Modified Fair Use Defense in Right of Publicity Cases*, 29 Wm & Mary L.Rev. 781 (1988); Marc J. Apfelbaum, *Copyright and the Right of Publicity: One Pea in Two Pods?*, 71 Geo. L.J. 287 (1983).

district court's rule in *Tin Pan Apple* is of minimal significance to the present case.

*Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc.*, 642 F.Supp. 1031 (N.D.Ga.1986), is the second case referred to in the Report. That district court rejected a fair use parody defense because "the primary purpose behind the defendant's parody is not an effort to make a social comment but is an attempt to make money." *Id.* at 830. In light of the Supreme Court's clarification of fair use in *Campbell*, which demoted "commercial purpose" from its misperceived status as a determinative factor to that of one among several factors, *supra*, the Court must look elsewhere for guidance.

The third case relied on by the Report is the Sixth Circuit's decision in *Acuff–Rose*, which was unanimously rejected by the Supreme Court for its excess reliance on the commercial purpose factor.

The Report's application of the copyright law use analysis found that Cardtoons trading cards have a commercial purpose, that they are not in a traditional medium, and thus, that they are deserving of little First Amendment protection. The Report confers excessive weight to the commercial aspect of Cardtoons, which is only one facet of the "purpose and character of the use." The commercial nature of Cardtoons was repeatedly emphasized in the Report and Recommendation. In overturning the Sixth Circuit, the Supreme Court stated, "[i]n giving virtually dispositive weight to the commercial nature of the parody, the Court of Appeals erred." *Acuff–Rose*, —— U.S. at ——, 114 S.Ct. at 1174. While the Report did not give "virtually dispositive" weight to the finding that Cardtoons trading cards are of a commercial nature, that finding was featured in the Report's analysis and conclusion.

The Report disregards the nature of the protected work, and fails to consider the "amount and substantiality of the portion used" in relation to the protected work as a whole. Finally, the Report did not address the "effect of the use upon the potential market for or value of" the protected work. Although Section 107 provides no more than

illustrative guidelines for analysis, the section loses its integrity when only one of its four guidelines is considered.

The Court concludes that copyright law's § 107 fair use guidelines can be referenced for general guidance in the Court's application of Oklahoma's right of publicity statute, but that the only case involving fair use and parody that is directly pertinent to the facts before the Court is the Supreme Court's pronouncement in *Acuff–Rose*, which was unavailable to the Magistrate Judge at the time the Report and Recommendation was prepared.[5]

■ The foundation for the Report's conclusion—the four analyses referred to in the Report's "Summary of Decisional Parody Defenses—" is unsteady. The "use analysis" and "balancing analysis" relied on in answering the question, "Does Cardtoons Have a Parody Defense," were imprecisely applied. Having reviewed the decisional parody defenses referred to in the Report, and having found them to be of minimal application to the present case, the Court judges Cardtoons' parody defense by applying a "use analysis" drawn from copyright law, with reference to the Supreme Court's discussion of First Amendment protections for parody in *Acuff–Rose*.

The first of the four guidelines in the fair use analysis is the "purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). Cardtoons trading cards are a commercial product. The cards were created to be distributed and sold in interstate commerce. Cardtoons trading cards express opinions on matters of public interest, but the expression of opinion is subsidiary to, or indistinguishable from, their commercial purpose.

A parody can be commercial in two ways: to advertise a separate product, or, as the product. In *White v. Samsung Electronics America, Inc.*, 971 F.2d 1395 (9th Cir.1992), *reh'g. denied*, 989 F.2d 1512 (9th Cir.1993), *cert. denied*, —— U.S. ——, 113 S.Ct. 2443,

---

5. The Report and Recommendation was adopted by the Court on November 23, 1993. *Campbell*

*v. Acuff–Rose Music, Inc.* was delivered by the Supreme Court on March 7, 1994.

124 L.Ed.2d 660, the Ninth Circuit interpreted California's right of publicity statute. Defendant Samsung published an advertisement which featured a robot standing on a stage before a large bank of revolving letters. The robot was dressed in a long blond wig and a sequined gown, and was posed with an arm outstretched. The image presented was strikingly similar to elements of a popular television game show. The Ninth Circuit ruled that the advertisement infringed the Plaintiff's right of publicity. The nature of the commercial use was the fact that the use was exactly that: a commercial. Vanna White's likeness, in the form of costumed robot, was used to advertise the virtues of Defendant's video cassette recorders. "The ad's spoof of Vanna White and Wheel of Fortune is subservient and only tangentially related to the ad's primary message: 'buy Samsung VCR'S.'" *Samsung*, 971 F.2d at 1401.

The focus on advertising in measuring the commercial character of a parody is maintained by the current unfinished draft of the Restatement: "if the name or likeness is used solely to attract attention to a work that has no relationship to the identified person, the user may be subject to liability for a use of the other's identity in advertising." *Restatement (Third) Unfair Competition* § 47 at 182 (Tentative Draft 4, 25 March 1993); *see also* William M. Borchard, *The Common Law Right of Publicity is Going Wrong in the United States: Waits v. Frito Lay and White v. Samsung Electronics*, Comment, 6 Ent.L.Rev. 208 (1992); John F. Hyland and Ted C. Lindquist, *White v. Samsung Electronics America, Inc.: The Wheels of Justice Take an Unfortunate Turn*, 23 Golden Gate U.L.Rev. 299 (1993).

In contrast, Cardtoons trading cards are not an advertisement for anything except themselves. "The use, for example, of a copyrighted work to advertise a product, even in a parody, will be entitled to less indulgence under the first factor of the fair use enquiry, than the sale of a parody for its own sake ..." *Acuff–Rose*, — U.S. at —, 114 S.Ct. at 1174. While the Supreme Court's analysis does not directly address the distinction between the two aforementioned types of commercial use, it does recognize that a parody sold for profit has a stronger claim to First Amendment protection than a parody used to advertise another unrelated product.

The second of the four fair use guidelines reads, "the nature of the copyrighted work." 17 U.S.C. § 107(2). In the present case, "copyrighted work" must be substituted with an equivalent term, such as, "protected interest," to reflect the discrepancy between copyright law and the right of publicity. Even with modification, this guideline is awkward in its application to the right of publicity. "Under this factor, the more creative a work, the more protection it should be accorded from copying; correlatively, the more informational or functional the plaintiff's work, the broader should be the scope of the fair use defense." 3 *Nimmer* § 13.05[A] at 13–170. The "work" or "protected interest" in Cardtoons is the MLBPA's right to control the likenesses of its members.

The nature of a likeness is factual: every person's face, for example, is unique. Factual works are subject to a broader scope of fair use. Construing creativity as originality, however, begets the finding that the uniqueness of a person's likeness is a function of creativity, which is entitled to substantial protection. The complications involved in attempting to contort this guideline into a form appropriate to the right of publicity convince this Court to exercise its discretion in discounting the second guideline from its fair use analysis.

The third guideline is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). Applied to the right of publicity, this guideline refers to whether Cardtoons took more than was necessary to accomplish its parodic purpose. Cardtoons has used the likenesses of baseball players to inform readers of the subject of each card's parody. Cardtoons did not use photographs. The trading cards did not depict graphically-precise drawings. Instead, Cardtoons accomplished its purpose with the use of caricatures. Plaintiff has taken features from players' likenesses to use as the basis for parodic artistic interpretations. Cardtoons

could have accomplished its parodic purpose by taking more from the players' likenesses, but it would have failed had it taken less than it did. Thus, this factor weighs in favor of fair use.

The fourth and final guideline is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). "If one looks to the fair use cases, if not always to their stated rationale, this emerges as the most important, and indeed, central fair use factor." 3 *Nimmer* § 13.05[A] at 13–183. The factor is "undoubtedly the single most important element of fair use." *Fisher v. Dees,* 794 F.2d 432, 437 (9th Cir.1986) (quoting *Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 566, 105 S.Ct. 2218, 2233, 85 L.Ed.2d 588 (1985)). Courts should "evaluate parody cases by examining the alleged infringement in terms of the purpose behind copyright, focusing largely on whether the parody is capable of serving as a substitute for the original." Beth Warnken Van Hecke, Note, *But Seriously, Folks: Toward a Coherent Standard of Parody as Fair Use,* 77 Minn.L.Rev. 465, 466 (1992).

Defendant has submitted substantial evidence that Plaintiff planned to market its cards in both the same market and manner as traditional, licensed baseball cards are sold. The objective of the evidence is to demonstrate that Cardtoons will expropriate market share from licensed baseball cards. Judith Heeter, Director of Licensing for the MLBPA, testified in her deposition, "[t]he sale of Cardtoons trading cards which are not authorized by the MLBPA will divert sales away from baseball trading cards or other products which are authorized by the MLBPA." Heeter Deposition at 8. Heeter provides no evidence to substantiate her contention, but simply stated, "[t]he amount of the loss of revenue to MLBPA and its members, as well as to authorized licensees, resulting from the sale of Cardtoons' trading cards is impossible to accurately determine."

Id. Heeter's statement appears to be based on the belief that Cardtoons are analogous to counterfeit baseball cards, and like a counterfeit of any product, the sale of unauthorized copies curtails sales of the original. If Cardtoons were a facsimile designed to appropriate market share, the fourth factor of the fair use analysis would lie in favor of a finding that Cardtoons were not a fair use. "The fourth factor looks to adverse impact only by reason of usurpation of the demand for [the original] work through [the] copying of protectable expression from such work." 3 *Nimmer* § 13.05[A] at 13–182.

Does Cardtoons' marketing of caricatured likenesses of baseball players satisfy market demand for players' likenesses? The Court finds this unlikely. An enormous market exists for traditional baseball cards. Every card ever produced has market value, and these values are tracked by several collectors' guides and catalogues.[6] A traditional card features an accurate representation, almost always photographic, of an individual player on one side, and reliable statistical data about that player's career on the reverse. The caricatures featured on one side of Cardtoons trading cards, and the irrelevant factual data or editorial commentary on the reverse, show Cardtoons' cards to be a completely different product. The trading cards are not a faithful counterfeit or reproduction of typical baseball cards. The people who would purchase Cardtoons' cards may be some of the same people who purchase traditional baseball cards, but Cardtoons trading cards are not a substitute product, and cannot fulfill demand for the original.

Thus, upon consideration of the fair use guidelines, the Court concludes that one guideline is inapplicable to the right of publicity, and three guidelines weigh in favor of a finding that Cardtoons trading cards are a "fair use."

■ "There is no Constitutional right to control one's right of publicity; there is a

---

6. *See, e.g., Sports Collectors Digest,* Krause Publications; *Tuff Stuff,* Tuff Stuff Publications, Inc. "The trading card market is now a $2.007 billion industry. Of that figure, the breakdown is $1.229 billion for baseball cards." James S. Thompson, Comment, *University Trading Cards:* *Do College Athletes Enjoy a Common Law Right to Publicity?,* 4· Seton Hall J. Sport L. 143, n. 62 (1994), (citing Manny Topol, *At Odds Over Cards; the Unanswered Billion–Dollar Question Is: Who Owns the Rights to the Players' Pictures,* Newsday, June 7, 1992, at 13).

Constitutional right to free speech." James L. Swanson, *Are the California Right of Publicity Statutes Unconstitutional?: A Second Look at Some First Amendment Problems,* 20 Beverly Hills Bar Assoc.Jour. 234, 235 (1986). As a restriction on speech, the right of publicity is susceptible to criticism on First Amendment grounds. "I doubt even a name-and-likeness-only right of publicity can stand without a parody exception," *Samsung,* 989 F.2d at 1519 (Kozinski, Circuit Judge, dissenting). Plaintiff has raised the argument that the Oklahoma statute is unconstitutional because it provides no explicit opportunity for parody to be sold. "Oklahoma has one of the most all-encompassing and generous bodies of right of publicity law in the country." Beavers, *supra,* at 2618. Were the Oklahoma statute's provisions rigidly applied by courts, the result would be that an individual claiming the right of publicity would enjoy absolute control over the dissemination of his or her likeness, as long as it is remotely recognizable. The propagation of parody would become entirely contingent on receiving permission from the subject. Such a result would be contrary to the purposes of the right of publicity and the First Amendment.

> [T]he power to license is the power to suppress. When the law gives a celebrity a right of publicity, it does more than funnel additional income her way. It gives her (or her assignee) a substantial measure of power over the production and circulation of meaning and identity in our society: power, if she so chooses, to suppress readings or appropriations of her persona that depart from, challenge, or subvert the meaning she prefers; power to deny to others the use of her persona in the construction and communication of alternative or oppositional identities and social relations; power, ultimately, to limit the expressive and communicative opportunities of the rest of us.

Michael Madow, *Private Ownership of Public Image: Popular Culture and Publicity Rights,* 81 Calif.L.Rev. 125, 145–146 (1993).

"Parodists will seldom get permission from those whose works are parodied. Self-esteem is seldom strong enough to permit the granting of permission even in exchange for a reasonable fee." *Fisher,* 794 F.2d 432, 437–438 (9th Cir.1986) (quoting Note, *The Parody Defense to Copyright Infringement: Productive Fair Use After Betamax,* 97 Harv.L.Rev. 1395, 1397 n. 12 (1984)). "[T]he more 'creative' the merchandiser's use—the more critical, satiric, or subversive its bite—the less likely it is that the celebrity will grant a license for it." Madow, *supra,* at 145, 146. Defendant has testified that even if Cardtoons applied for a license, one would not be forthcoming: "MLBPA would never license a parody which poked fun at the players." R. and R. at 8 (838 F.Supp. at 1508). "Poking fun" is the essence of parody. "The right of publicity derived from public prominence does not confer a shield to ward off caricature, parody and satire." *Guglielmi v. Spelling–Goldberg Productions,* 25 Cal.3d 860, 160 Cal.Rptr. 352, 358, 603 P.2d 454, 460 (1979). Were the statute exploited to its full potential, the art of parody, in a commercial context, would cease to exist. Defendant's reliance on Oklahoma's right of publicity statute is an example of how the target of a parody can employ the statute to censor parody before it is ever disseminated.

The statute could only have this deleterious effect if the Court initially found that commercial parody is unprotected by the First Amendment. Because this Court agrees with others in finding that commercial parody is protected by the First Amendment, any statute that effectively outlaws commercial parody could not withstand constitutional scrutiny. The Court recognizes that there are valid constitutional concerns regarding the Oklahoma statute. The Court also acknowledges the principle of statutory interpretation that "courts should construe statutes to avoid constitutional defects." *Wilson v. N.L.R.B.,* 920 F.2d 1282, 1288 (6th Cir. 1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 3025, 120 L.Ed.2d 896 (1992). Thus, the Court bases its decision in this case upon the application of copyright law to the right of publicity. In doing so, the Court recognizes a parody exception to the Oklahoma statute. Cardtoons' product falls within this exception, despite the fact that it is a parody that is sold for commercial gain. Accordingly, Cardtoons' product does not violate Okla.

Stat. tit. 12, § 1449. Therefore, the Court declines to adopt the Magistrate Judge's Report and Recommendation.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment (Docket #11) is GRANTED. Defendant's Motion for Declaratory Judgment (Docket #17) is DENIED. Defendant's Motion for Attorney Fees and Costs (Docket #44) is DENIED. Plaintiff's Motions for Temporary Restraining Order, Preliminary Injunction, and Expedited Ruling (Docket #2) are DENIED as MOOT. Plaintiff's Motion for New Trial (Docket #52) is DENIED as MOOT.