LUCERO, Circuit Judge.
This case requires us to decide whether Noerr-Pennington immunity can attach to threats of litigation made with probable cause. Applying the “objectively baseless” test articulated in Professional Real Estate Investors, Inc. v. Columbia Pictures, Inc., 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993), the district court concluded that the non-consummated threats of a lawsuit made by the Major League Baseball Players Association to Cardtoons and Champs Marketing, Inc., enjoy Noerr-Pennington protection. We exercise jurisdiction pursuant to 28 U.S.C. § 1291,' and affirm.
I
Cardtoons, L.C. (“Cardtoons”), produces parody trading cards that feature caricatures of active major league baseball players.[1] Cardtoons contracted with Champs Marketing, Inc. (“Champs”), an Ohio corporation, to print the cards. Major League Baseball Players Association (“MLBPA”), the exclusive collective bargaining agent for all active major league baseball players, is the assignee of the publicity rights of current players and handles licensing agreements authorizing the use of their identities.
In a letter to Cardtoons dated June 18, 1993 (“Cardtoons letter”), MLBPA claimed that by producing and selling the cards, Cardtoons was “violating] the valuable property rights of MLBPA and the players.” The MLBPA threatened to “pursue its full legal remedies” if Cardtoons refused to cease production and sale of the cards. Appellant’s App. at 8-9. In a similar letter dated the same day (“Champs letter”), MLBPA also threatened Champs with litigation if it did not stop “participating in Cardtoons’s illegal activities.” Appellant’s App. at 10. Upon receipt of the letter, Champs notified Cardtoons that it intended to stop printing the cards.
• Four days later, Cardtoons filed suit in federal district court for a declaratory judgment on the issue of whether its cards violated MLBPA’s publicity and intellectual property rights. Also seeking injunctive relief,[2] Cardtoons asked the court to bar MLBPA from interfering with Champs and other third parties involved in the production and sale of the cards. Additionally, the suit alleged that MLBPA had tortiously interfered with Cardtoons’s contractual relations with Champs. MLBPA moved to dismiss the complaint for lack of subject matter jurisdiction, and filed counterclaims seeking declaratory judgment, injunctive relief, and damages under Oklahoma’s publicity rights statute, Okla. Stat. tit. 21 § 839.1 and 839.2 (1993).
Unless Cardtoons was entitled to produce and sell the cards, as alleged in the claim for declaratory judgment, it could not recover damages on the tortious interference claims. Therefore, the parties agreed that before the adjudication of Cardtoons’s tort claim, a magistrate judge should conduct an evidentiary hearing and issue a report limited to Cardtoons’s declaratory judgment claim and MLBPA’s counterclaims.
*1135 Concluding that Cardtoons’s activities violated the baseball players’ rights of publicity under Oklahoma law, the magistrate recommended judgment on these claims in favor of MLBPA. The district court initially adopted the recommendation. See Cardtoons, L.C. v. Major League Baseball Players Ass’n, 838 F.Supp. 1501 (N.D.Okla.1993). Following the Supreme Court’s decision in Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994), however, the district court concluded that the parody cards enjoyed First Amendment protection against MLBPA’s infringement claims. Accordingly, the court vacated its initial decision and entered judgment for Card-toons. See Cardtoons, L.C. v. Major League Baseball Players Ass’n, 868 F.Supp. 1266 (N.D.Okla.1994) (“Cardtoons I ”). We affirmed, holding that the parody cards are “an important form of entertainment and social commentary that deserve First Amendment protection.” Cardtoons, L.C. v. Major League Baseball Players Assoc., 95 F.3d 959, 976 (10th Cir.1996) (“Cardtoons II ”).
Having prevailed on the declaratory judgment claim, Cardtoons returned to the district court to pursue its claims for damages against MLBPA. In addition to the claim for tortious interference with contract, Cardtoons asserted new claims for prima facie tort, libel, and negligence, all stemming from the allegations contained in the Cardtoons and Champs letters. Concluding that both letters were immune from liability under the “Noerr-Pennington” doctrine, the district court granted summary judgment for MLBPA and dismissed all of Cardtoons’s state law claims. See Cardtoons, L.C., v. Major League Baseball Players Ass’n, No. 93-C-576-E (N.D.Okla. Mar. 12, 1998) (“Cardtoons III”). Cardtoons challenges the court’s application of the Noerr-Pennington doctrine and appeals the grant of summary judgment.[3] Cardtoons also appeals the court’s decision to stay discovery pending its ruling on MLBPA’s motion for summary judgment.
II
As originally articulated, the Noerr-Pennington doctrine provides general immunity from antitrust liability to private parties who petition the government for redress, notwithstanding the anti-competitive purpose or consequences of their petitions. See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 135-38, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) (establishing immunity for petitions to state legislature); see also United Mine Workers of America v. Pennington, 381 U.S. 657, 670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (extending Noerr immunity to petitions of public officials). The Court later extended Noerr-Pennington immunity to the right of access to courts. See California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (citations omitted). Moreover, because it emanates from the First Amendment right of petition, see Bright v. Moss Ambulance Service, Inc., 824 F.2d 819, 821 n. 1 (10th Cir.1987) (quoting City of Lafayette, La. v. Louisiana Power & Light Co., 435 U.S. 389, 399, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978)), Noerr-Pennington immunity stands independent of its aborigine roots in antitrust, see, e.g., Bill Johnson’s Restaurants, Inc. v. NLRB, 461 U.S. 731, 742-43, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) (immunizing employer from prosecution for unfair labor practice even if an otherwise valid suit against employee is driven by a retaliatory motive); NAACP v. Claiborne Hardware Co., 458 U.S. 886, 913-14, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) (immunizing a nonviolent business boycott seeking to vindicate economic and equal rights); South Dakota v. Kansas City Southern Indus., Inc., 880 F.2d 40, 50 (8th Cir.1989) (immunizing defendant from claim of interference with contractual relations).
*1136 Although broad and extensive, Noerr-Pennington immunity is not a shield for a petitioner whose conduct, although “ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere with the business relationships of a competitor.” Noerr, 365 U.S. at 144, 81 S.Ct. 523. The Supreme Court has established a two-part definition of sham litigation:
First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under Noerr, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively merit-less may a court examine the litigant’s subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals “an attempt to interfere directly with the business relationships of a competitor,” Noerr; 365 U.S. at 144, 81 S.Ct. 523, through the “use [of] the governmental process' — as opposed to the outcome of that process — as an anticompetitive weapon,” Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 380, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). This two-tiered process requires the plaintiff to disprove the challenged lawsuit’s legal viability before the court will entertain evidence of the suit’s economic viability.
Professional Real Estate Investors, Inc. v. Columbia Pictures, Inc., 508 U.S. 49, 60-61, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993).
To ascertain “baselessness,” a court must consider whether the litigant had “probable cause” to initiate the legal action. Id. at 62, 113 S.Ct. 1920. If there is probable cause, the defendant automatically enjoys Noerr-Pennington immunity, and the second, subjective motivation prong of the Professional Real Estate test becomes irrelevant. See id. at 63, 113 S.Ct. 1920. Probable cause to sue may exist when the law is unsettled or when an “action [is] arguably ‘warranted by existing law’ or at the very least [is] based on an objectively ‘good faith argument for the extension ... of existing law.’ ” Id. at 65, 113 S.Ct. 1920 (quoting Fed.R.Civ.P. 11).
Neither the Supreme Court nor this circuit has directly addressed the issue of whether Noerr-Pennington immunity attaches to the mere threat of a law suit. Confronted with this issue, however, three other circuits have concluded that prelitigation threats of suit enjoy the same immunity as litigation itself, so long as the threats are not shams. See McGuire Oil Co. v. Mapco, Inc., 958 F.2d 1552, 1558-60 (11th Cir.1992); CVD, Inc. v. Raytheon Co., 769 F.2d 842, 850-51 (1st Cir.1985); Coastal States Mktg., Inc. v. Hunt, 694 F.2d 1358, 1367 (5th Cir.1983). In so holding, the Fifth Circuit reasoned that “it would be absurd to hold that [petitioning immunity] does not protect those acts reasonably and normally attendant upon effective litigation. The litigator should not be protected only when he strikes without warning.” Coastal States, 694 F.2d at 1367. Commentators have agreed with this extension and have further developed the policy rationales behind it. See, e.g., Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law § 205e at 237 (rev. ed.1997) (withholding immunity from prelitigation communication would curb practices that “provide useful notice and facilitate the resolution of controversies”); Herbert Hovenkamp, Federal Antitrust Policy § 18.3d at 644 (1994) (immunizing prelitigation threats is vital to “[o]ur entire dispute resolution process[, which] is designed to encourage people to resolve then-differences if possible before litigating”).[4]
*1137 We adopt the legal and policy rationales that have informed other circuits’ extension of Noetr-Pennington immunity to prelitigation threats, and hold that whether or not they are consummated, such threats enjoy the same level of protection from liability as litigation itself.[5] In addition, when considering whether prelitigation threats enjoy Noerr-Pennington immunity, we conclude that we must apply the two-part sham test of Professional Real Estate.[6]
III
‘We review the grant or denial of summary judgment de novo, applying the same legal standard used by the district court pursuant to Fed.R.Civ.P. 56(c).” Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir.1996) (citation and internal quotation omitted). Summary judgment is appropriate “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c). In the Noerr-Pennington context, “a court may decide probable cause as a matter of law” at the summary judgment stage when a defendant raises Noerr-Pennington immunity as a defense and the predicate facts are undisputed. Professional Real Estate, 508 U.S. at 63, 113 S.Ct. 1920.
A
If MLBPA had probable cause to threaten Champs with litigation, the Champs letter enjoys Noerr-Pennington immunity under the Professional Real Estate test. To determine whether there was probable cause, we must first consider the validity of the underlying threatened action — the infringement suit against Cardtoons for its parody cards — and then turn to the validity of a cause of action against Champs as the printer of the cards.
*1138 Prior to our decision in Cardtoons II, the only federal appellate court decision addressing the constitutional tensions inherent in a celebrity parody provided some legal support for MLBPA’s allegations against Cardtoons. See Cardtoons II, 95 F.3d at 970 (discussing White v. Samsung Electronics America, Inc., 971 F.2d 1395 (9th Cir.1992)). At the time of its preliti-gation threats against Champs, MLBPA therefore had probable cause to believe that Cardtoons’s parody cards infringed its publicity rights. Furthermore, as Card-toons II demonstrates, MLBPA’s infringement claim was premised on a reasonable argument that its publicity rights outweighed Cardtoons’s free speech rights. See Cardtoons II, 95 F.3d at 970-76 (applying balancing test and concluding that Cardtoons’s speech rights prevail over MLBPA’s property rights). Therefore, although MLBPA’s infringement claim did not prevail, our prior adjudication shows that “a similarly situated reasonable litigant could have perceived some likelihood of success.” Professional Real Estate, 508 U.S. at 65, 113 S.Ct. 1920. As such, the district court could reasonably conclude that MLBPA’s threats against Cardtoons were “an objectively plausible effort to enforce rights” and deserved Noerr-Pen-ningtoh protection. Id.
Cardtoons argues that even if MLBPA’s threats against Cardtoons enjoy immunity, our decision in Cardtoons II does not resolve the issue of whether Noerr-Pen-nington immunity attaches to the Champs letter. In Cardtoons II, we applied Oklahoma’s statutory right of publicity law. Here, Cardtoons asserts, Ohio’s common law of publicity rights controls because Ohio is the locus of Champs’s conduct and its state of residence, and therefore has the most significant contacts to the torts alleged. Ohio’s “incidental use” exception to the right of publicity, Cardtoons contends, provides MLBPA with less protection for its publicity rights than it enjoyed under Oklahoma law. Under Ohio law, therefore, MLBPA lacked probable cause for its threats against Champs.
Ohio law recognizes an incidental use exception to its right of publicity law that applies when a person’s name or likeness is used “for purposes other than taking [commercial] advantage of his reputation, prestige, or other value associated with him.” Zacchini v. Scripps-Howard Broadcasting Co., 47 Ohio St.2d 224, 351 N.E.2d 454, 459 n. 4 (Ohio), rev’d on other grounds, 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977) (quotation and internal citation omitted). In our prior adjudication, we specifically noted that Oklahoma’s right of publicity statute also contains a provision that is analogous to the concept of “incidental use.” See Cardtoons II, 95 F.3d at 968. We discern no marked difference between the incidental use exception in Oklahoma and Ohio. In both states the applicability of the exception turns on the degree to which a defendant derives commercial benefit from its use of the plaintiffs name or likeness. See 12 Okla. Stat. title § 1449(E) (1999) (stating that whether the use of a person’s “likeness [is] so directly connected with commercial” activity as to constitute a violation of the right of publicity presents a question of fact); Zacchini, 351 N.E.2d at 458 n. 4 (stating that although the incidental use exception under Ohio law does not apply to the commercial exploitation of another’s likeness, the mere fact that a defendant “seeks to make profit” from his endeavor is not enough to establish commercial use).
Moreover, MLBPA had a colorable claim for infringement under Ohio law. One Ohio court has applied the incidental use exception in a situation in which the defendant used an Olympic athlete’s name and likeness in the context of accurate, historical information on disposable drinking cups. See Vinci v. American Can Co., 69 Ohio App.3d 727, 591 N.E.2d 793, 794 (Ohio Ct.App.1990). Because this use was not meant to support or promote the cups, the court found it to be merely incidental. See id. In our conclusion in Cardtoons II that the Oklahoma incidental use exception was inapplicable to the parody cards, we noted that “the players were specifically *1139 selected for their wide market appeal,” and the use of their likeness was “directly connected with a proposed commercial endeavor.” Cardtoons II, 95 F.3d at 968. Accordingly, MLBPA’s claim would not have been foreclosed under Ohio law.
Even if MLBPA had probable cause to assert a claim of infringement against Champs in Ohio, Cardtoons argues, MLBPA lacked probable cause for the Champs letter because as a printer, Champs was a passive actor and is liable as a contributory tort infringer only if it knew or had reason to know that it was aiding and abetting an infringement. See, e.g., Misut v. Mooney, 124 Misc.2d 95, 475 N.Y.S.2d 233, 236 (N.Y.Sup.Ct.1984); Maynard v. Port Publications, Inc., 98 Wis.2d 555, 297 N.W.2d 500, 507 (Wis.1980). The Champs letter, however, provided the very notice that Misut and Maynard require. Cardtoons cannot argue that Champs was not liable unless it had notice of an infringement, while also contending that MLBPA rendered itself ineligible for Noerr-Pennington immunity by providing the required notice.[7]
We therefore need not resolve the conflict of law and publicity rights issues that Cardtoons raises, because under either potentially controlling legal regime, MLBPA would have had probable cause on its infringement claim against Champs. Accordingly, the Champs letter enjoyed Noerr-Pennington immunity as a threat of litigation.
B
Cardtoons contends that NoerrPennington immunity does not extend to its libel claim against MLBPA, which is based not on the MLBPA’s threat of litigation but on the allegations in the Champs letter that Cardtoons violated the law. Specifically, the Champs letter states, “[MLBPA] believe[s] that the activities of [Cardtoons] violate the valuable property rights of publicity of the MLBPA and the players themselves.” Appellant’s App. at 10. The letter contains no further statements of fact or law concerning Cardtoons and its activities, except to characterize them as “illegal.” Id.
We hold that a defendant like MLBPA, who has probable cause to threaten litigation and makes no assertion beyond the legal and factual bases for the threats, may enjoy Noerr-Pennington immunity from a claim of libel. This holding is not inconsistent with McDonald v. Smith, 472 U.S. 479, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985). There, the Court held that the First Amendment does not provide absolute immunity for petitions to the government that express libelous and damaging falsehoods. See id. at 485, 105 S.Ct. 2787. In so holding, the Court relied on the principle at the core of the NoerrPennington doctrine that “ ‘baseless litigation is not immunized by the First Amendment right to petition.’ ” Id. at 484, 105 S.Ct. 2787 (quoting Bill Johnson’s Restaurants, 461 U.S. at 743, 103 S.Ct. 2161).
We have already concluded that MLBPA’s threats of litigation were not baseless because it had probable cause to assert a publicity rights infringement claim against Cardtoons. The statements that Cardtoons labels as libelous are coextensive with the threats of litigation to which we have already attached Noerr-Penning-ton immunity. If Cardtoons’s argument prevails, a defendant would be exposed to libel claims even if his litigation or threat to litigate were supported by probable cause. By allowing an alternative cause of action against petitions that are otherwise eligible for immunity, the argument renders Noerr-Pennington a nullity.
*1140 IV
Cardtoons argues that it was prejudiced by the district court’s stay of discovery pending its adjudication of MLBPA’s summary judgment motion. It claims the stay barred it from attempting to discover whether MLBPA had any intent to pursue legal action against Champs, and whether MLBPA had performed any research on potential legal claims prior to issuing the threatening letters. Furthermore, Cardtoons claims that it hoped to discover evidence of MLBPA’s subjective intent to dissuade Champs from performing its legitimate duties under its contract with Cardtoons.
Under the Professional Real Estate test, however, MLBPA’s subjective intent would have been relevant only if its threats were objectively baseless. MLBPA presented sufficient predicate facts to demonstrate to the district court that as a matter of law, MLBPA had probable cause to threaten suit against Cardtoons and Champs, and that therefore its threats were not objectively baseless. Having affirmed the district court’s conclusion that MLBPA is immune from all of Cardtoons’s state law claims, we must affirm the district court’s stay of discovery. See Professional Real Estate, 508 U.S. at 65-66, 113 S.Ct. 1920 (holding that without proof that defendant’s infringement action was objectively baseless, circuit court correctly denied request for further discovery).
The district court’s opinion is AFFIRMED.

. A more thorough description of the humorous cards, as well as the less humorous litigation surrounding the cards’ production, can be found in Cardtoons, L.C. v. Major League Baseball Players Assoc., 95 F.3d 959, 962-64 (10th Cir.1996).

. As part of its request for injunctive relief, Cardtoons sought a temporary restraining order and preliminary injunction to prevent MLBPA from interfering with Cardtoons’s contractual relations with Champs. Card-toons subsequently withdrew its request for these additional remedies when they were rendered moot by Champs’s decision to stop producing the cards.

. In its briefs, Cardtoons seems to appeal the grant of summary judgment only with respect to the Champs letter. We note, however, that our conclusions would not change if the appeal also involved the Cardtoons letter.

. Applying Noerr-Pennington protection to prelitigation threats is especially important in the intellectual property context, where warning letters are often used as a deterrent against infringement. See, e.g., Matsushita Electronics Corp. v. Loral Corp., 974 F.Supp. 345, 359 (S.D.N.Y.1997) (concluding that policing letters sent to suspected patent infring- *1137 ers enjoyed Noetr-Pennington immunity); Thermos Co. v. Igloo Products Corp., 1995 WL 842002, *4 (N.D.Ill. Sept.27, 1995) (same, for policing letters to alleged trademark infringers); see generally Ronald B. Coolley, Notifications of Infringement and Their Consequences, 77 J. Pat. & Trademark Off. Soc’y 246, 246 (1995) (describing notification of suspected intellectual property infringers as a "common reaction” of rights holders).

. The dissent would bifurcate the test for granting Noerr-Pennington immunity by applying the more lenient Professional Real Estate standard when a party files suit, while requiring a party who merely issues a threat to demonstrate that he acted both in "good-faith” and as a "proximate prologue to actual or imminent litigation.” Diss. Op. at 1142. This approach creates an incentive to litigate, and would not, as the dissent maintains, protect poorly financed entities like Champs from "private bullying communication.” Diss. Op. at 1141. Instead, such companies would become more vulnerable to ruinous lawsuits, as the threatening letter takes the form of a legal complaint.

. All of the prelitigation cases from other circuits were decided before Professional Real Estate, and provide us with no uniform standard to determine when a threat to litigate is worthy of Noerr-Pennington protection. See, e.g., McGuire Oil, 958 F.2d at 1560-61 & n. 12 (applying subjective test and objectively baseless test); CVD, 769 F.2d at 851 (applying both a "bad faith” test and a test for clear and convincing evidence that the defendant's claim was objectively baseless); but see Coastal States, 694 F.2d at 1372 ("A litigant should enjoy petitioning immunity from the antitrust laws so long as a genuine desire for judicial relief is a significant motivating factor underlying the suit.”). We note, however, that to the extent these cases are inconsistent with Professional Real Estate, they are unfaithful to the Noerr-Pennington doctrine. See Professional Real Estate, 508 U.S. at 57, 60, 113 S.Ct. 1920 (describing the "objective reasonableness” test as part of the "original formulation” of the Noerr-Pennington sham exception, and declaring that “fidelity to precedent compels us to reject a purely subjective definition of 'sham' "). Indeed, the Eleventh Circuit, when applying a test for sham litigation after the Supreme Court had granted certio-rari but before it had decided Professional Real Estate, implied that whatever test the Supreme Court articulates for granting immunity for litigation under Noerr-Pennington must similarly apply to prelitigation threats. See McGuire Oil, 958 F.2d at 1560-61 & n. 12.

. Moreover, the law of contributory infringement in the publicity rights context is not so settled that it would foreclose MLBPA from making a good faith argument for the extension of existing law by asserting a claim against Champs. See 1 J. Thomas McCarthy, The Rights of Publicity and Privacy § 3.7[E] (1999) (arguing that contributory infringement of a publicity right by a “passive actor" is a colorable claim for which there should be liability).