**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 14 2003**

**PATRICK FISHER**
**Clerk**

CARDTOONS, L.C., an Oklahoma
Limited Liability Company,

     Plaintiff-Appellant,

v.

MAJOR LEAGUE BASEBALL
PLAYERS ASSOCIATION, an
unincorporated association,

     Defendant-Appellee.

No. 02-5134

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. 93-CV-576-E)**

James W. Tilly (Craig A. Fitzgerald with him on the briefs) of Tilly & Fitzgerald,
Tulsa, Oklahoma, for Plaintiff-Appellant.

Russell S. Jones, Jr., of Shughart Thomson & Kilroy, P.C., Kansas City, Missouri
(Susan C. Hascall of Shughart Thomson & Kilroy, P.C., Overland Park, Kansas,
with him on the brief), for Defendant-Appellee.

Before **SEYMOUR**, **McKAY**, and **LUCERO**, Circuit Judges.

**McKAY**, Circuit Judge.

This is an appeal of a grant of summary judgment in favor of Defendant-Appellee Major League Baseball Players Association ("MLBPA") with respect to Appellant's state-law claims of tortious interference with contractual relations, libel and prima facie tort, and the entry of final judgment in Appellee's favor.

The dispute began in 1992 when Appellant Cardtoons L.C. ("Cardtoons") was formed to produce and market parody trading cards of active Major League baseball players. In 1993, Cardtoons contracted with Champs Marketing, Inc. ("Champs") to print and distribute the cards. MLBPA, as the exclusive group licensing agent for active Major League baseball players, sent Cardtoons and Champs each a cease-and-desist letter on June 18, 1993, threatening legal action if the cards were printed.

On June 22, 1993, Cardtoons initiated an action seeking a declaration that the cards did not violate MLBPA's publicity rights and also seeking damages for tortious interference with contractual relations. The district court bifurcated the claims. With respect to the declaratory judgment request, the court initially entered judgment in favor of MLBPA, finding that the cards violated MLBPA's publicity rights. Following the Supreme Court's decision in Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569 (1994), in which the Court first recognized "fair use" protection under the First Amendment for commercial parody speech, the district court amended its judgment and entered declaratory judgment in favor of

Cardtoons. Cardtoons, L.C. v. Major League Baseball Players Ass'n, 868 F. Supp. 1266 (N.D. Okla. 1994) ("*Cardtoons I*"). This court affirmed that decision in Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d 959, 979 (10th Cir. 1996) ("*Cardtoons II*").

The case then returned to the district court where Cardtoons pursued its claims for damages. Cardtoons amended its complaint to include claims for libel, prima facie tort, and negligence. MLBPA moved for summary judgment, arguing that its threats of litigation were immune from liability under the Noerr-Pennington doctrine. See Mine Workers v. Pennington, 381 U.S. 657 (1965); Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961). The district court agreed with MLBPA and granted summary judgment on all of Cardtoons' state-law claims. Cardtoons, L.C. v. Major League Baseball Players Ass'n, No. 93-C-576-E (N.D. Okla. Mar. 12, 1998) ("*Cardtoons III*"); Aplt. App. at 348. A panel of this court affirmed the district court, holding that the Noerr-Pennington doctrine applied to threats of litigation as well as actual litigation. Cardtoons, L.C. v. Major League Baseball Players Ass'n, 182 F.3d 1132 (10th Cir. 1999) ("*Cardtoons IV*").

After rehearing en banc, this court vacated the panel decision in *Cardtoons IV* and remanded the case for further proceedings. Cardtoons, L.C. v. Major League Baseball Players Ass'n, 208 F.3d 885 (10th Cir. 2000) ("*Cardtoons V*").

The en banc court held that Noerr-Pennington did not apply and that prelitigation communications between private parties were not immunized by the right to petition the government guaranteed by the First Amendment because there was no petition addressed to the government.

On remand, MLBPA filed another motion for summary judgment, seeking a judgment as a matter of law on the remaining tort claims. The district court granted MLBPA's motion for summary judgment and issued a final order for MLBPA and against Cardtoons. Cardtoons, L.C. v. Major League Baseball Players Ass'n, 93-C-576-E (N.D. Okla. Aug. 12, 2002) ("*Cardtoons VI*"). Cardtoons has appealed the grant of summary judgment with respect to the claims of tortious interference, libel and prima facie tort.

We must determine whether, on these facts, a genuine issue of fact remains with respect to any of Cardtoons' state-law claims. All three claims arise from the sending of the cease-and-desist letter to Champs. Cardtoons alleges that (1) the letter to Champs contains libelous statements; (2) by sending the letter, MLBPA tortiously interfered with the contractual relationship between Cardtoons and Champs; and (3) MLBPA's conduct in sending the letter was "generally culpable and not justified under the circumstances." We examine each claim in turn.

In reviewing a grant of summary judgment, we must determine whether,

viewing the record in the light most favorable to the non-moving party, there exist any genuine issues of material fact. Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999); Wolf v. Prudential Ins. Co. of America, 50 F.3d 793, 796 (10th Cir. 1995). To prevail on a claim of tortious interference with a contractual relationship, Oklahoma law requires that a plaintiff prove:

1. That it had a business or contractual right with which there was interference.
2. That the interference was *malicious* and wrongful, *and* that such interference was neither justified, *privileged* nor excusable.
3. That damage was proximately sustained as a result of the complained-of interference.

Morrow Dev. Co. v. American Bank and Trust Co., 875 P.2d 411, 416 (Okla. 1994). The Oklahoma Supreme Court has further explained that

> [o]ne who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract . . . does not interfere *improperly* with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

Id. (citation and quotation omitted). Our inquiry, therefore, turns on whether MLBPA acted in good faith in threatening to initiate legal action to protect its publication rights if Champs printed the cards.

We are not the first to consider this issue in this case. On remand, after the

first appeal, the district court in *Cardtoons III* stated:

> Here, the case history establishes objective reasonableness. The Report and Recommendation of the Magistrate, the initial ruling of this Court and the conclusions of the appellate court all acknowledge the reasonableness of MLBPA's position and the fact that the issue presented a close call.

*Cardtoons III* at 4, Aplt. App. at 351. Similarly, the panel in *Cardtoons IV* held that MLBPA had probable cause to threaten Champs with legal action. *Cardtoons IV* at 1139. The district court, in its most recent opinion, also held that Cardtoons could not show that "the interference was malicious and wrongful, and that such interference was neither justified, privileged nor excusable." *Cardtoons VI* at 9, Aplt. App. at 729 (quoting *Cardtoons V)*. Nevertheless, because the en banc court vacated the decision in *Cardtoons IV*, we are not bound by that panel's determination that MLBPA had probable cause to threaten legal action. Furthermore, we must review the most recent grant of summary judgment *de novo* and determine whether factual issues remain with respect to the reasonableness of MLBPA's threats of legal action.

Cardtoons' contention is that the threat of legal action was made in bad faith since MLBPA was aware that Cardtoons would assert a parody/First Amendment defense and would therefore be immune from liability. However, at the time the letter was sent, courts were split on whether parody was protected under the "fair use" doctrine of the First Amendment. In fact, when the district

court first ruled on the issue, it held that Cardtoons was *not* protected by the parody defense. It was not until March 1994, when the Supreme Court issued its opinion in Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569 (1994), that the law became somewhat settled. It was that ruling by the Supreme Court which caused the district court to vacate its original grant of summary judgment in favor of MLBPA and hold in favor of Cardtoons. See *Cardtoons I*. Furthermore, Cardtoons conceded this point in its brief in *Cardtoons IV* when it stated that "Cardtoons readily recognizes that at this stage of the dispute, before this Court issued its ruling on the right of publicity and First Amendment issues, the law in this area was unclear." Aple. Supp. App. at 4.

Having conceded that the law with respect to the parody/First Amendment defense was unclear, Cardtoons attempts to make a distinction between MLBPA's threats of legal action against Cardtoons and the threats against Champs. Cardtoons points out that, while MLBPA's attorneys spent approximately forty hours researching potential claims against Cardtoons, they spent little or no time researching potential claims against Champs before sending Champs a cease-and-desist letter. The facts, as alleged by Cardtoons, indicate that upon learning of Cardtoons' plans to produce parody cards, MLBPA instructed its lawyers to research the issue and proceed if there was a likelihood of success. As Cardtoons alleges, the lawyers' research likely focused primarily, or even exclusively, on the

potential liability of Cardtoons and the potential success of a parody defense. It is unlikely that they spent much, if any, time researching the potential liability of Champs. After conducting the research, the lawyers informed MLBPA that, in their opinion, Cardtoons' plans likely violated the publicity rights of the MLBPA. Acting on this advice, MLBPA issued the cease-and-desist letters to both Cardtoons and Champs.

Cardtoons' argument is unpersuasive. As Cardtoons appears to concede, the law with respect to the parody/First Amendment defense was not clearly settled until the Supreme Court issued its decision in Campbell v. Acuff-Rose Music, Inc. and a panel of this court issued a decision with respect to those issues in *Cardtoons II*. Any claim against Champs would necessarily turn on the same essential issues of law with the addition of some basis for manufacturer liability. MLBPA had no need to repeat the research on the parody defense with respect to Champs. Having determined, with the advice of counsel, that there was a likelihood that the cards violated MLBPA's publicity rights, MLBPA threatened legal action against both parties involved in the production of the cards. MLBPA never actually sued Champs because Champs agreed not to print the cards.

Cardtoons also alleges that MLBPA's primary purpose in threatening legal action was to harm Cardtoons rather than protect MLBPA's publicity rights. Specifically, Cardtoons alleges that MLBPA was primarily concerned with

stopping the production of the cards because they were unflattering to Major League baseball players. Cardtoons may well be correct in asserting that part of MLBPA's motivation in threatening legal action was to prevent the production of cards that they believed to be unflattering. Nevertheless, the existence of such a motive, which we presume for purposes of summary judgment, would certainly not preclude MLBPA from threatening to protect its publicity rights with legal action so long as it is "accompanied by honest intent, and . . . [it is done] to better one's own business and not to principally harm another." Morrow, 875 P.2d at 416 n.21 (citation and quotations omitted). Other than this alleged improper motive, Cardtoons has provided no additional evidence of either MLBPA's intent to harm Cardtoons or that such an intent was MLBPA's primary motivation in threatening Champs with legal action. At best, Cardtoons' allegations about MLBPA's motives amount to multiple legitimate business interests and not intentions to harm Cardtoons.

Based on these facts, viewed in the light most favorable to Cardtoons, we agree with the district court that "Cardtoons cannot show that 'the interference was malicious and wrongful, and that such interference was neither justified, privileged nor excusable.'" *Cardtoons VI* at 9, Aplt. App. at 729 (quoting *Cardtoons V*).

Cardtoons' libel claim also turns on whether MLBPA acted in good faith in

threatening to sue Champs if it printed the cards. To succeed on its libel claim, Cardtoons must plead and prove that MLBPA made:

> (1) a false and defamatory statement concerning [Cardtoons]; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either the actionability of the statement irrespective of special damage, or the existence of special damage caused by the publication.

Sturgeon v. Retherford Publ'ns, Inc., 987 P.2d 1218, 1223 (Okla. Ct. App. 1999) (citing Restatement (Second) of Torts § 558 (1977)). In granting summary judgment to MLBPA on this claim, the district court based its decision on the applicability of the litigation privilege without considering the other elements of libel.

Oklahoma has long recognized the litigation privilege under which attorneys, parties, jurors, and witnesses are immune from defamation liability for statements made in the course of judicial or quasi-judicial proceedings, so long as the statements are relevant to the proceeding. Samson Inv. Co. v. Chevaillier, 988 P.2d 327, 329-30 (Okla. 1999) (citing Pacific Employers Ins. Co. v. Adams, 168 P.2d 105 (1946)). Oklahoma has extended this privilege to statements made in anticipation of litigation. Kirschstein v. Haynes, 788 P.2d 941 (Okla. 1990). As the Oklahoma Supreme Court has recognized, "[A]s long as the speaker or writer of the defamatory communication has an actual subjective good faith belief that litigation is seriously contemplated the privilege attaches whether or not he

has a good faith belief in the truth of the communication." Id. at 952.

Cardtoons contends that MLBPA did not subjectively intend to file suit against Champs and that the evidence supports such an inference. In support of this assertion, Cardtoons argues that MLBPA threatened suit within twenty-four hours of learning that Champs was the printer, conducted no research with respect to Champs' potential liability or the court in which suit would be filed, and never made any effort to initiate suit against Champs.

However, the evidence also shows that MLBPA conducted legal research with respect to a potential claim that the cards violated MLBPA's publicity rights and that, upon deciding that they had a valid claim that the cards violated their publicity rights, they sent cease-and-desist letters to both the designer and printer of the cards. The fact that they had not taken steps to file suit or decided in which court to file is insufficient to infer that they did not intend to file suit if the cards were printed. Likewise, as discussed above, the fact that MLBPA did not conduct legal research specific to Champs is understandable considering that the uncertain legal issue involved the infringing nature of the cards and not the liability of a printer of infringing cards.

Finally, Cardtoons contends both in the briefs and at oral argument that MLBPA's failure to eventually bring suit leads to an inference of bad faith. Such an inference in misguided. Requiring potential plaintiffs to bypass the post office

-11-

on the way to the courtroom would undermine our longstanding policy favoring efforts to avoid litigation.

The facts indicate that MLBPA had an "actual subjective good faith belief that litigation [was] seriously contemplated." See id. Cardtoons has provided no evidence to the contrary. Viewed in the light most favorable to Cardtoons, MLBPA's actions were hasty and their legal theory debatable. However, neither of these inferences rises to the level of subjective bad faith. Even if MLBPA had not made the necessary preparations to file suit, it is likely that if Champs continued to print the cards then MLBPA would have taken steps to enforce its rights. The litigation privilege was properly applied and MLBPA was entitled to immunity and summary judgment with respect to the libel claim.

Cardtoons' final claim on appeal is for prima facie tort. As the district court noted, it is questionable whether Oklahoma even recognizes liability for prima facie tort. Cardtoons' only authority for the existence of such a tort is an opinion of this court in which, in the absence of any authoritative Oklahoma case law and relying solely on an article in the Oklahoma Bar Journal, we stated that Oklahoma appeared to have adopted the tort. See Merrick v. Northern Natural Gas Co., 911 F.2d 426, 433 (10th Cir. 1990) (citing Cressman, The Prima Facie Tort Doctrine in Oklahoma: Common Law Protection of Business From Unjustified Interference, 56 Okla. B.J. 1759, 1759 (1985)). Our cases are not

binding on the Oklahoma courts with respect to Oklahoma law. Since our decision in Merrick, the Oklahoma Supreme Court has explained that "the expression 'prima facie tort' does not appear to have ever been recognized in Oklahoma." Patel v. OMH Med. Ctr., Inc., 987 P.2d 1185, 1189-90 n.2 (Okla. 1999).

Nevertheless, we need not further speculate about the vitality of prima facie tort in Oklahoma because, even assuming that Oklahoma would recognize the tort, Cardtoons' claim would fail on the merits. As we have recognized before, to prevail at common law on a theory of prima facie tort, a plaintiff must show that the defendant's conduct was "generally culpable and not justified under the circumstances." National Ass'n of Prof'l Baseball Leagues, Inc. v. Very Minor Leagues , Inc., 223 F.3d 1143, 1151 (10th Cir. 2000) (citing Restatement (Second) of Torts § 870)). As we explained in our discussion of the interference with contractual relations claim *supra*, Cardtoons has not shown that by sending the letter MLBPA acted maliciously or wrongfully or that MLBPA's actions were not privileged, justified, or excusable. For the same reasons discussed above, Cardtoons has raised no evidence to justify an inference that MLBPA's conduct was "generally culpable." Furthermore, our holding that MLBPA's conduct is immunized by the litigation privilege would seem to satisfy the second element of the common law prima facie tort that the conduct be "not justified under the

-13-

circumstances." Therefore, summary judgment for MLBPA on the prima facie

tort claim was not in error.

**AFFIRMED.**