963 A.2d 890 (2007)
405 N.J. Super. 173
NEW JERSEY SPORTS PRODUCTIONS, INC., Plaintiff,
v.
BOBBY BOSTICK PROMOTIONS, LLC and Kermit Cintron, Defendants.
Superior Court of New Jersey, Chancery Division, Essex County. General Equity Part.
Decided May 25, 2007.
*892 Patrick C. English, for plaintiffs (Dines and English, L.L.C., attorneys, Clifton).
Stephen L. Dreyfuss, Newark, for defendant Bobby Bostick Promotions, L.L.C. (Hellring, Lindeman, Goldstein & Siegal, L.L.P., attorneys).
Sheldon S. Lustigman, New York City, for defendant Kermit Cintron (The Lustigman Firm, P.C., attorneys).
KLEIN, J.S.C.
This case comes before the court on motion of the plaintiff to dismiss defendant's counterclaim pursuant to Rule 4:6-2(e) or, in the alternative, for summary judgment. The dispute between the parties emanates from the boxing arena. Boxing, like other professional sports, has taken on the characteristics of big business. Among other things, its athletes avail themselves of agents and promoters to enhance and advance their careers.
The facts as presented are rather straightforward. Plaintiff New Jersey Sports Productions, Inc. d/b/a Main Events ("NJSP") is engaged in promoting professional boxing matches. On or about January 14, 2005, NJSP entered into a contract ("Promotion Agreement") with defendant Kermit Cintron to promote his bouts. The Promotion Agreement provided that it could be terminated by NJSP if Cintron lost a bout promoted by NJSP. NJSP promoted a bout that took place in April 2005 between Cintron and another welterweight boxer, Antonio Margarito. Cintron lost that bout.
Subsequently, NJSP exercised its right to terminate the Promotion Agreement. Cintron, however, remained bound by a clause that gave NJSP a "right of first negotiation/last refusal." This clause provided that Cintron was required to negotiate with NJSP for a new deal for thirty days after NJSP's termination. If no deal was reached during that period, Cintron was free to negotiate with other promoters, subject only to the requirement that he present any offers to NJSP within fourteen days of receipt. If NJSP declined to match such an offer, Cintron was free to sign with the other promoter. NJSP's right to match was to be effective for no longer than six months from the date of NJSP's termination.
Defendant Bobby Bostick Promotions, L.L.C. ("Bostick") was engaged in the same business as plaintiff. On August 4, 2005, in an e-mail expressly recognizing NJSP's right to match, Cintron's counsel provided detailed terms for a promotional contract offered to Cintron by Bostick. NJSP declined to match the offer given, but expressly reserved future rights in the event that the offer was not fulfilled. On or about August 17, 2005, Cintron entered into a contract with Bostick.
Bostick thereafter promoted a bout between Cintron and David Estrada in April 2006, without challenge from NJSP. On October 26, 2006, in a Bostick-sponsored bout against Mark Suarez, Cintron won the International Boxing Federation (IBF) welterweight title. It was after this event that NJSP asserted rights under the Promotion Agreement.
On December 5, 2006, NJSP's counsel sent a letter to both Bostick and Cintron alleging that the terms of the contract between those parties had been materially altered after NJSP declined to match, and that those amended terms were not disclosed to NJSP. Specifically, NJSP claimed that there was a substantial diminution of the minimum purses for a title challenge as well as for a non-title bout, elimination of substantial bonuses, and a reduction in the required number of bouts. The letter stated as follows:

*893 We respectfully suggest that it constitutes an impermissible tortious interference to proffer terms that are not adhered to to wean a boxer away from the promoter which, to that point, had developed the boxer's career. We further respectfully suggest that it is a breach not to disclose when proffered terms are altered.
Main Events is hereby asserting its rights.
This suit followed on or about December 19, 2006, seeking injunctive and declaratory relief, and damages.
On or about February 20, 2007, Bostick filed its answer and counterclaim. The counterclaim alleges that NJSP intentionally interfered with a contractual relationship between Bostick and Cintron, and that the alleged tortious conduct of NJSP deprived Bostick of its prospective economic advantage. The relevant paragraphs of the counterclaim describe the tortious conduct as follows:
13. On December 5, 2006, NJSP sent a letter to Kermit Cintron and BBP [Bostick] asserting continuing contractual rights to Kermit Cintron despite the fact that NJSP had long ago released Kermit Cintron to sign with BBP and any right of first/last refusal had long ago expired.
14. Shortly thereafter, still in December 2006, NJSP filed the instant action seeking equitable relief based on claims that it knew were meritless.
By way of the present motion, plaintiff alleges that the counterclaim for tortious interference and deprivation of prospective economic advantage, based solely upon the December 2006 letter and the filing of a complaint, must be dismissed because such conduct is absolutely privileged and/or immunized.
When reviewing a motion to dismiss for failure to state a claim, courts must accept the facts asserted in the pleading as true, and give the pleader the benefit of all inferences that may be drawn in its favor. Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746, 563 A.2d 31 (1989). In Banco Popular N. Am. v. Gandi, 184 N.J. 161, 876 A.2d 253 (2005), the Supreme Court expressed the standard for such a motion as follows:
Trial courts are cautioned to search the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary. At this preliminary stage of the litigation [a] [c]ourt [should not be] concerned with the ability of plaintiffs to prove the allegation contained in the complaint.... [P]laintiffs are entitled to every reasonable inference of fact. The examination of a complaint's allegations of fact required by the aforestated principles should be one that is at once painstaking and undertaken with a generous and hospitable approach.... Obviously, if the complaint states no basis for relief and discovery would not provide one, dismissal is the appropriate remedy.
[Id. at 165-66, 876 A.2d 253 (citations omitted).]
Defendant Bostick urges that the standard to be applied to this motion is that of summary judgment, for the reason that plaintiff relies on matters outside the pleadings, namely the letter of December 5, 2006. It points to the language of Rule 4:6-2 providing that if a motion to dismiss is converted to a motion for summary judgment, "all parties shall be given reasonable opportunity to present all material pertinent to such a motion." Consequently, defendant argues that the motion is premature because discovery is incomplete, see Velantzas v. Colgate-Palmolive *894 Co., 109 N.J. 189, 193, 536 A.2d 237 (1988), and that it expects to be able to identify more acts of interference by NJSP through discovery.
Defendant is incorrect. The letter of December 5, 2006, is expressly referred to in Bostick's pleading and therefore, can be considered without converting the motion to dismiss into one for summary judgment. Acevedo v. Monsignor Donovan High Sch., 420 F.Supp.2d 337, 340 (D.N.J.2006); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d. Cir.1997). Under the relevant standard of Rule 4:6-2(e), "the inquiry is confined to a consideration of the legal sufficiency of the alleged facts apparent on the face of the challenged claim." Rieder v. State Dep't of Transp., 221 N.J.Super. 547, 552, 535 A.2d 512 (App.Div.1987) (citation omitted). In other words, the motion is based upon the content of the pleading in and of itself. A motion to dismiss "may not be denied based on the possibility that discovery may establish the requisite claim; rather, the legal requisites for plaintiffs claim must be apparent from the complaint itself." Edwards v. Prudential Prop. & Cas. Co., 357 N.J.Super. 196, 202, 814 A.2d 1115 (App.Div.2003).
Here, a fair reading of the counterclaim discloses no more than two allegedly tortious acts by plaintiff: (1) the sending of the December 5, 2006, letter (Par. 13) and (2) the filing of the instant action (Par. 14). It is well-settled under the common law of New Jersey that individuals and corporations have an absolute privilege to bring complaints in both judicial and quasi-judicial forums without fear of defamation actions for utterances made in the course of proceedings and having some relation thereto. Rainier's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552, 562-63, 117 A.2d 889 (1955). The Court in Rainier's Dairies recognized the strong policy "in favor of free access to judicial and quasi-judicial bodies." Id. at 564, 117 A.2d 889; see also Binkewitz v. Allstate Ins. Co., 222 N.J.Super. 501, 508, 537 A.2d 723 (App.Div.), certif. denied, 113 N.J. 378, 550 A.2d 481 (1988) (holding that absolute privilege is necessary "to encourage persons involved in [such] proceedings to express themselves freely and without fear of retribution," so long as the offending statements bear some relation to the proceedings); Peterson v. Ballard, 292 N.J.Super. 575, 581, 679 A.2d 657 (App.Div.), certif. denied, 147 N.J. 260, 686 A.2d 761 (1996).
Rainier's Dairies explained the balancing of interests in favor of affording absolute immunity in court proceedings as follows:
[I]n strictly judicial proceedings the potential harm which may result from the absolute privilege is somewhat mitigated by the formal requirements such as notice and hearing, the comprehensive control exercised by the trial judge whose action is reviewable on appeal, and the availability of retarding influences such as false swearing and perjury prosecutions; and the view has been expressed that it is only the potential harm as thus mitigated which may properly be considered outweighed by the public interest in favor of broad access by suitors to the courts.

[19 N.J. at 562, 117 A.2d 889 (emphasis added).]
It is readily apparent that if the counterclaim was premised solely upon the filing of the complaint in this matter, it would be subject to dismissal, without more. This would be so even if the complaint contained false statements made with malice or ill motive, which is not here alleged. Therefore, the only real issue in this case is whether or not the sending of the December 2006 letter is actionable. Plaintiff characterizes it as a "prelitigation letter," *895 a common practice among attorneys prior to filing suit. According to plaintiff, it furnishes an opportunity for the recipient to acknowledge the writer's position, or to dispute it. Such a letter has as its purpose to cause the recipient to reconsider its actions, and hopefully, to prompt negotiations toward an amicable resolution of the dispute.
This issue is one of first impression in this State. No New Jersey court has held that the absolute privilege afforded to judicial proceedings extends to an attorney's "prelitigation letter." Defendant, arguing against such an extension, cites Devlin v. Greiner, 147 N.J.Super. 446, 371 A.2d 380 (Law Div.1977). In that case, the issue was whether the report of a private detective hired by a husband to obtain evidence of adultery against his wife, rendered prior to their divorce action, should be deemed absolutely privileged. Id. at 452, 371 A.2d 380. The wife and her paramour sued the detective on various grounds including libel, privacy and intentional infliction of mental distress.
The court acknowledged its responsibility to "not lightly extend the grant of absolute privilege to new situations unless the policy upon which the privilege is based is found to exist." Id. at 456, 371 A.2d 380 (citation omitted). Whereas the previously decided cases involved situations where the statements were made during judicial or quasi-judicial proceedings, the report in Devlin v. Greiner, supra, 147 N.J.Super. at 452, 371 A.2d 380, was issued some two months before litigation. The court characterized the request for absolute immunity as a "privilege asserted to be retroactively conferred by the later filing of the divorce action." Id. at 458, 371 A.2d 380. It noted that because none of the safeguards of the judicial system enumerated in Rainier's Dairies were present, it was "troubled by the potential for abuse in the area of prelitigation communications." Id. at 459, 371 A.2d 380. The court denied summary judgment to allow for discovery and a hearing as to whether the privilege should be no more than a qualified one.
The factual context of Devlin is significantly different than the present case. The subject letter was drafted by counsel and sent only to the parties, Bostick and Cintron, who would be brought into court mere weeks later. There was no third party involved and no publication of the letter. There are no allegations of falsity as to its contents and no claims for defamation. What was crucial to the court in Devlin was an investigative report issued some two months before litigation that was alleged to be almost totally false. Devlin v. Greiner, supra, 147 N.J.Super. at 460, 371 A.2d 380.
A number of federal courts have had occasion to address the identical issue facing this court and have found that letters threatening court action are entitled to immunity to the same extent as the litigation itself. See, e.g., Cardtoons, L.C. v. Major League Baseball Players Ass'n, 335 F.3d 1161 (10th Cir.2003); Matsushita Elecs. Corp. v. Loral Corp., 974 F.Supp. 345 (S.D.N.Y.1997); McGuire Oil Co. v. Mapco, Inc., 958 F.2d 1552 (11th Cir.1992); CVD, Inc. v. Raytheon Co., 769 F.2d 842 (1st Cir.1985); Coastal States Mktg., Inc. v. Hunt, 694 F.2d 1358 (5th Cir.1983). The language in Coastal States is particularly enlightening: "it would be absurd to hold that [petitioning immunity] does not protect those acts reasonably and normally attendant upon effective litigation. The litigator should not be protected only when he strikes without warning." Coastal States, supra, 694 F.2d at 1367 (emphasis added). See also Matsushita Elecs. Corp. v. Loral Corp., supra, 974 F.Supp. at 355, 359 (dismissing tortious interference claim based in part upon letters sent to defendants *896 in a separate patent infringement suit, informing them of the case and inviting them to engage in "discussions of possible license arrangements" in order to avoid the expense of litigation, and conferring immunity upon same).
It is well settled that to prevail on a claim of tortious interference with a contractual relationship, a plaintiff must prove: (1) a business or contractual right that was interfered with; (2) that the interference was malicious and wrongful, and neither justified, privileged nor excusable; and, (3) that damage was proximately sustained as a result thereof. Louis Kamm, Inc. v. Flink, 113 N.J.L. 582, 588, 175 A. 62 (E. & A.1934); Printing Mart-Morristown v. Sharp Elecs. Corp., supra, 116 N.J. at 751-52, 563 A.2d 31. The Kamm case and others recognize the broad societal interest in pursuing one's business "free from undue interference or molestation." 113 N.J.L. at 586, 175 A. 62. The problem arises when that interest bumps up against the "counter-policy in favor of free access to judicial and quasi-judicial bodies." Rainier's Dairies v. Raritan Valley Farms, supra, 19 N.J. at 564, 117 A.2d 889.
It is instructive that in Rainier's Dairies, the claim for malicious inference with business was remanded to the trial court with the following pertinent observation:
If the policy [of free access to the courts], which in defamation actions affords an absolute privilege or immunity to statements made in judicial and quasi-judicial proceedings, is really to mean anything then we must not permit its circumvention by affording an almost equally unrestricted action under a different label.
[Ibid.]
There is good reason for the courts of this State to confer an absolute privilege upon the widespread practice among law-yers of prelitigation correspondence threatening suit on behalf of their clients. Such communications promote and further the strong public policy favoring the settlement of litigation that is well-recognized in a long line of cases in New Jersey and elsewhere. See, e.g., Puder v. Buechel, 183 N.J. 428, 437-38, 874 A.2d 534 (2005); Cardtoons, supra, 335 F.3d at 1167 ("Requiring potential plaintiffs to bypass the post office on the way to the courtroom would undermine our longstanding policy favoring efforts to avoid litigation."). The purpose of such letters is to motivate a response in the form of an accommodation which, if satisfactory to the writer, avoids the need for further action. While the court is not aware of any statistical data by which to measure its success in averting litigation, common sense tells us that pre-suit dialogue nips a number of disputes in the bud. The court docket in each of the vicinages is already overcrowded, and the judiciary is being challenged to employ all appropriate means to combat the growing backlog of cases. Because the pre-suit letter has the potential of preventing a matter from ever reaching the courts, it is an integral part of the dispute resolution process.
If, on the other hand, the privilege is not extended to this type of communication, lawyers will be reluctant to write to their adversaries for fear of exposing clients to additional claims. Litigation counsel's efforts to achieve some relief at a modicum of cost will be chilled; clients will be advised to plunge headlong into suit or risk a defamation or tortious interference claim from a pre-suit letter. Considering how routine is the resort to pre-suit correspondence (which sometimes is parried back and forth), a virtual sea change in litigation practice would result.
The majority of lawsuits, moreover, would become entangled in claims premised *897 upon the contents of a pre-suit letter. Absent the applicability of an absolute privilege, exploration of such issues as reasonable belief and/or good faith in issuing the letter, the client's reliance on advice of counsel, etc., would be necessitated. The result would be a trial within a trial on these issues, with the potential of prolonging, confusing and complicating the case for the trier of fact. This flies in the face of another important policy, namely judicial economy and efficiency.
This is not to say that every piece of correspondence prior to litigation deserves to be cloaked with privilege. To be afforded protection, the contents of the letters(s) must bear a relationship to the subject matter of the action. The letter should be written and sent by counsel for the party rather than the party itself, in order to curb the potential for abuse. It is believed that attorneys know better than their clients how to craft the language to achieve the desired purpose, while at the same time avoiding a message that is purely inflammatory or intimidating. The letter should be basically factual and straightforward, without resort to hyperbole or scurrilous diatribes. Such a communication should evidence a reasonable belief that the client has a legitimate interest deserving of protection by appropriate means.
Turning now to the letter that the counterclaim in this case alleges to be tortious conduct, it can readily be seen that it meets the criteria. First of all, it is a letter from NJSP's counsel directed to the party with whom it contracted (Cintron) and the third party who allegedly interfered with NJSP's contractual rights (Bostick). The letter is tailored to the facts as NJSP understood them. These very same facts were recited in the complaint filed on behalf of NJSP within a matter of weeks thereafter. It would be incongruous to protect the complaint, but not the letter containing virtually identical information that warned of it. The assertion of rights that allegedly interfered with another's contract is not malicious or wrongful, and should be deemed justified, privileged and excusable.
It is true, as Bostick's attorney notes, that the letter makes no specific mention of litigation or threat thereof. Nevertheless, a fair reading of the entire letter is that some type of enforcement action would ensue if NJSP did not receive recognition of the rights it was asserting. There is no prescribed format or magic language for a prelitigation letter. Same is best left to the judgment of counsel, and may vary depending upon the nature of the dispute and the past relationship between the parties.
The final factor to be addressed is the timing of the communication in relation to the commencement of suit. The court in Devlin v, Greiner, supra, 147 N.J.Super. at 457, 371 A.2d 380, took note of the fact that it was dealing with a report issued two months before litigation ensued, "at a time when litigation had not been instituted, and may not even have been contemplated." This is a non-issue in this case inasmuch as the complaint was filed literally on the heels of the subject letter. Even were our facts different, this court would decline to impose a rigid or bright line rule in this respect. The timing issue is best left to a case by case determination.
Assume, for instance, that an attorney's letter prompts a protracted period of negotiation, during which the plaintiff forbears from suit. Ultimately, months later, suit is filed because an agreement could not be reached. To remove the privilege from the letter under these circumstances would be tantamount to a penalty for engaging in the very settlement process that it was designed to foster. Under other *898 factual situations, however, an unreasonable delay may give rise to an inference that the letter was not sufficiently related to or connected with contemplated litigation to warrant application of the absolute privilege.
Because the court finds that both allegedly tortious acts are absolutely privileged, the counterclaim in this matter shall be dismissed in its entirety for failure to state a claim upon which relief can be granted. Plaintiffs counsel is directed to submit an order in accordance with this opinion.